## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 24 2020, 6:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.B., D.O., P.F., & K.B. (Minor Children) and L.F. (Mother);

L.F. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services and Child Advocates, Inc.,

*Appellees-Petitioners*

April 24, 2020

Court of Appeals Case No.
19A-JT-1935

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1812-JT-1397
49D09-1812-JT-1398
49D09-1812-JT-1399
49D09-1812-JT-1400

**May, Judge.**

[1] L.F. ("Mother") appeals the involuntary termination of her parental rights to J.B., D.O., P.F., and K.B. (collectively, "Children"). Mother argues she was denied due process when the Department of Child Services ("DCS") did not offer her certain reunification services. In addition, Mother contends the evidence does not support the trial court's finding and conclusions that the conditions under which Children were removed from Mother's care would not be remedied,[1] termination was in Children's best interests, and there existed a suitable plan for the care and treatment of Children following the termination of Mother's parental rights. We affirm.

# Facts and Procedural History

[2] Mother is the biological mother[2] of J.B., born March 20, 2008; D.O., born September 1, 2009; P.F., born May 27, 2011; and K.B., born August 18, 2016. In March 2016, DCS filed a petition alleging J.B., D.O., and P.F. were

---

[1] Mother also alleges the trial court's findings do not support its conclusion that the continuation of the Mother-Children relationships posed a threat to Children's well-being. Because we hold the trial court's findings supported its conclusion that the conditions under which Children were removed from Mother's care would not be remedied, we need not consider Mother's argument regarding whether the continuation of the parent-children relationship posed a risk to Children's well-being. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999) (because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the court need find only one requirement to terminate parental rights), *reh'g denied, trans. denied, cert. denied* 534 U.S. 1161 (2002).

[2] D.B. is the father of J.B. and K.B.; his parental rights were also terminated. He does not participate in this appeal. De.O. is the father of D.O. and P.F.; his parental rights were also terminated. He does not participate in this appeal.

Children in Need of Services ("CHINS") based on an incident of domestic violence between Mother and De.O., who is the father of D.O. and P.F. Mother entered into an Informal Adjustment and J.B., D.O. and P.F. were allowed to stay in Mother's home because Mother "was following through with the criminal case for [De.O., Mother] agreed to participate in services and [Mother's] home appeared to be safe and the children appeared to be taken care of in her home at that time." (Tr. Vol. II at 16.)

[3] K.B. was born on August 18, 2016, and was released to Mother's care under the Informal Adjustment. The Informal Adjustment was closed on October 21, 2016, when the CHINS petition related to the termination proceeding before us was filed. The new CHINS petition alleged additional incidents of domestic violence in the home involving Mother, the fathers of all of the children, and Mother's sister; Mother was not compliant with domestic violence services as part of the Informal Adjustment; and Mother admitted K.B. tested positive for cocaine at birth. Children were removed from Mother's care and placed in foster care.

[4] On November 1, 2016, Mother admitted the allegations in DCS's CHINS petition, and the trial court adjudicated Children as CHINS. The trial court entered its dispositional order the same day, requiring Mother to engage in homebased therapy and case management, complete a substance abuse assessment and follow all recommendations, complete a domestic violence assessment and follow all recommendations, visit with Children, and submit to drug screens. After several review hearings during which service providers

testified that Mother was compliant with services, the trial court approved a temporary home trial visit on January 23, 2018, and Children were returned to Mother's care.

[5] Prior to the March 20, 2018, review hearing, the Family Case Manager ("FCM") went to Mother's house. She observed

> debris and clutter throughout the home. . . like trash, empty water bottles, empty coke [sic] bottles. There were clothes scattered kind of all throughout the children's bedrooms and piles of clothes. Piles of like – like they were taking food to their room, so they'd have plates and things kind of – just kind of scattered throughout the different rooms. There were plates in the living, kitchen and dining area with food that was decaying on them. The kitchen was overflowing with dishes. There were pots and pans with still [sic] food on them[.]

(*Id*. at 29-30.) The FCM asked Mother to clean up the house, and testified, "it's not best practice for DCS to just immediately remove [children] from an unclean home. We wanted to give her a chance to correct the situation." (*Id*. at 30.) Additionally, the FCM was concerned because J.B., who was nine years old at the time, was responsible for waking his younger siblings to school because Mother "just had a hard time getting up in the morning." (*Id*. at 28.)

[6] On March 21, 2018, the FCM went to Mother's house to hold a team meeting and administer a drug screen as ordered by the trial court during the March 20, 2018, review hearing. The purpose of the team meeting was to discuss the closure of the CHINS case because Mother was close to completing many of the required services, though the state of Mother's home and her continuation

of domestic violence services were a concern. Upon her arrival, the FCM could hear a child crying. She knocked on the door, and Mother refused to answer for ten to fifteen minutes. When Mother answered the door, she appeared "to be in disarray. Her hair was kind of everywhere, her eyes were bloodshot." (*Id.* at 32.) The FCM asked Mother why she did not immediately answer the door and Mother "asked [her] to leave, she told [her] that she didn't want [her] to come in, she was cursing and didn't want [her] in the home." (*Id.* at 33.)

[7] Mother eventually allowed the FCM into the home, where the FCM observed J.B. and Mother's aunt trying to clean up the house. Mother told the FCM, "I can't do this anymore just go ahead and take them." (*Id.* at 34.) Mother then told J.B., "I love you, but you're going to have to go." (*Id.*) The FCM called for an emergency drug screener to come to the home. After submitting a specimen for the screen, Mother told the FCM that "she had been using cocaine for two to three weeks prior to that screen . . . [and] that she had [J.B.] pee in a pill bottle and hid it under the bathroom sink and try to use that as her own sample." (*Id.* at 36.) The FCM removed Children from Mother's home immediately and they were placed in foster care, where they remained for the rest of the proceedings.

[8] The trial court held a detention hearing on March 23, 2018, and Mother did not appear. Her counsel indicated he had attempted to contact Mother and she had not responded. The trial court amended the dispositional order to require Mother to complete two weeks of in-patient drug treatment. At the November 27, 2018, permanency hearing, the trial court changed Children's permanency

plan from reunification to adoption because the case had been open for over two years, Mother had become non-compliant with services, Mother did not have housing, and Mother had not completed the ordered drug treatment.

[9] On December 13, 2018, DCS filed its petitions to terminate Mother's parental rights to Children. On April 25, 2019, Mother filed a motion to hold a permanency hearing. She argued she had been compliant with services and visiting with Children. The trial court granted her motion the same day and scheduled a permanency hearing for June 18, 2019. Mother did not appear at the June 18, 2019, permanency hearing.

[10] On June 27, 2019, the trial court held a fact-finding hearing on DCS's termination petitions. Mother attended the fact-finding hearing. On July 8, 2019, the trial court entered its order terminating Mother's parental rights to Children.

# Discussion and Decision

## Standard of Review

[11] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a

parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[12]     "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id.* at 836.

[13]     To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[14] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

## 1. Due Process

[15] When DCS seeks to terminate a parent's parental rights, it must do so in a manner that meets the requirements of the due process clause. "Although due process has never been precisely defined, the phrase embodies a requirement of 'fundamental fairness.'" *J.T. v. Marion Cty. Office of Family & Children*, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), *reh'g denied*, *trans. denied*, *abrogated on other grounds by Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035,

1041 (Ind. 2004) (quoting *E.P. v. Marion County Office of Family & Children*, 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995). In addition, "procedural irregularities in a CHINS proceedings [sic] may be of such import that they deprive a parent of procedural due process with respect to the termination of his or her parental rights." *A.P. v. Porter County Office of Family & Children*, 734 N.E.2d 1107, 1112-13 (Ind. Ct. App. 2000), *trans. denied*.

[16] Mother argues her due process rights were violated when DCS did not provide her services to address alleged mental health issues. As an initial matter, we note Mother did not raise this issue before the trial court, and thus the issue is waived. *See McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003) (parties cannot raise issue for the first time before the appellate court, including some constitutional issues). Waiver notwithstanding, "failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009). Further, "a parent may not sit idly without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). Based thereon, we conclude Mother's due process rights were not violated by DCS's failure to provide her with mental health services.

## 2. Reasonable Probability that Conditions Not Remedied

[17] A trial court must judge a parent's fitness to care for her child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010).

Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Mother argues DCS did not present sufficient evidence to support the trial court's findings and that those findings do not support its conclusion that the conditions under which Children were removed from Mother's care would not be remedied.

[18] To support its conclusion that the conditions under which Children were removed from Mother's care would not be remedied, the trial court found:

> 33. [Mother] has not completed home based therapy despite multiple referrals.
>
> 34. [Mother] has not successfully completed home based case management, although the referral remains open.
>
> 35. [Mother] has participated in domestic violence services. However, she has not successfully completed this service.
>
> 36. [Mother] has admitted to using cocaine as recently as the spring of 2019.
>
> * * * * *
>
> 44. [Mother] is currently receiving supervised parenting time. She has not had unsupervised parenting time since [Children] were removed in March 2018.

* * * * *

46. [Mother] is not currently engaged in domestic violence services. She was involved in an unstructured program at a local church until the May 2019 incident.

47. There is a reasonable probability that the conditions that resulted in [Children's] removal and continued placement outside of the home will not be remedied by [Mother] or by [D.B.]. [Mother] has been involved with the CHINS court for nearly three and a half years. She has failed to successfully complete services despite multiple referrals and continues to use cocaine as recently as the spring of 2019.

(App. Vol. II at 18-19.)

[19] While Mother does not directly challenge any particular finding, she asks this court to consider testimony presented at the fact-finding hearing that supports her argument. For example, the visitation supervisor testified Mother provided Children with appropriate food and age-appropriate activities during supervised visitation and that Mother was bonded with Children. Further, another service provider testified Mother's home was appropriate at the time of the termination hearing, that the service provider did not have any safety concerns regarding Children, and that visitation should be allowed to occur in Mother's home.

[20] As noted in the facts of this opinion, Children were removed from Mother's care for domestic violence and substance abuse. While Mother made progress throughout the CHINS proceedings, her efforts were not consistent. When Mother was granted a trial home visit with Children in January 2018, Mother's

substance abuse and unsafe living conditions forced DCS to remove Children and place them into foster care less than two months after trial home placement with Mother. Mother failed to complete certain services and admitted using illegal substances within months of the termination hearing.

[21] Mother's requests that we believe the testimony of one service provider over another are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Based thereon, we conclude the trial court's findings supported its conclusion that the conditions under which Children were removed from Mother's care would not be remedied. *See In re B.J.*, 879 N.E.2d 7, 19 (Ind. Ct. App. 2008) (affirming termination of parental rights although father was initially compliant with services because progress eventually stalled and conditions were remained unimproved), *trans. denied*.

## 3. Children's Best Interests

[22] In determining what is in Children's best interests, a trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the children. *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-

appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in Child's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[23] Mother argues termination of her parental rights to Children is not in Children's best interests because two service providers testified that Mother should be given more time to complete services and that Mother was bonded with Children. Specifically, she directs us to testimony from Davetta Sanders, who supervised visits between Mother and Children from September 2018 through May 2019, and Nikita King, who supervised visits between Mother and Children from October 2017 until Sanders took over in September 2018. King also indicated she would be supervising visits scheduled after the termination hearing.

[24] Sanders testified that, based on her interaction with Mother and Children for one eight-hour period per week, Mother should be given the opportunity to have in home visits with Children and termination of Mother's parental rights is not in Children's best interests because

> [Children] always talk about how they want to see [Mother]
> when – when – when they get in the care, [sic] they want to know
> how long it's going to take to get to her and at the end of the visit
> two or three kids are crying at the end or wondering why is the
> visit over.

(Tr. Vol. II at 104.) King testified that, based on her interaction with Mother and Children in 2017 and 2018, termination of Mother's parental rights was not in Children's best interests because

> [a]lthough [Mother's] been in this for so long [Mother] has come a long way with a lot of things and we wasn't [sic] taking care of the pieces that we needed to take care of within her services. Now I think those are being addressed, the issues are being actually addressed and I think that we might have a difference there.

(*Id.* at 122.) When asked about the "pieces" Mother was now addressing, King stated, "we never addressed mental health." (*Id.* at 123.)

[25] Regarding Children's best interests, the trial court found:

> 31. [J.B.]; [D.O.]; and [P.F.] are all placed together in foster care. [J.B.] and [D.O.] have been there for eleven months. [P.F.] has been there for nine months. They are bonded with their foster parents. They are happy and their needs are being met. This is pre-adoptive placement.

> 32. [K.B.] has been placed in a separate foster home for two months. He is bonded and doing well. This is also a pre-adoptive placement. He had previously resided in the home as a respite care placement.

* * * * *

> 37. Christine Ackerman of Ireland Home Based Services has provided home based therapy for [J.B]; [D.O.]; and [P.F.] since 2016.

38. When Ms. Ackerman began working with the children, they were residing with [Mother].

39. Ms. Ackerman has observed anger in the children. Their anger escalated when they were removed from [Mother's] custody in October 2016.

40. After [Children] were returned to [Mother's] care and custody in January 2018, Ms. Ackerman observed the home in disarray and observed a bottle of medicine within reach of [Children].

41. Following [Children's] second removal from [Mother's] care and custody in January 2018, Ms. Ackerman observed more severe anger from the children.

42. Ms. Ackerman believes that the children need the stability and consistency that they currently have in their placements and that further moves would have lasting detrimental effects to [sic] their mental health.

\* \* \* \* \*

49. Termination of the parent-child relationship is in the best interests of [Children]. Termination would allow them to [be] adopted into a stable and permanent home where their needs will be safely met.

(App. Vol. II at 18-19.) In addition to Ackerman, the FCM and the Guardian ad litem testified that termination of Mother's parental rights was in Children's best interests.

Mother's requests that we believe the testimony of one service provider over another are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Based thereon, we conclude the trial court's findings supported its conclusion that termination of Mother's parental rights to Children was in Children's best interests. *See In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000) (termination in child's best interest based on service provider recommendations that parental rights be terminated and evidence that the conditions under which child was removed from parents' care would not be remedied), *abrogated on other grounds by In re G.P.*, 4 N.E.3d 1158, 1163 (Ind. 2014).

## 4. Satisfactory Plan for Care Following Termination

Pursuant to Indiana Code section 31-35-2-4(b)(2)(D), parental rights cannot be terminated unless DCS provides sufficient evidence of a satisfactory plan for the care and treatment of the children following termination. Mother argues DCS did not present a satisfactory plan for Children's care and treatment following the termination of Mother's parental rights because

> no definitive evidence was presented as to the foster parents, except that [Children] were bonded with the foster families and that the foster homes were appropriate. Further, [J.B.], [D.O.], and [P.F.] were in a placement separate from the two-year old, [K.B.]. DCS presented no evidence that [Children] would be able to maintain their sibling relationship after adoption.

(Br. of Appellant at 56.)

[28]	The trial court found in its order that Children were in pre-adoptive foster placements and were all bonded with their foster parents. The trial court concluded the plan for Children's future care and treatment was adoption. Adoption is a sufficient plan for children's care following termination of a parent's rights. *See In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008) (adoption is satisfactory plan for child's care and treatment after termination). Additionally, such a plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.*, 804 N.E.2d at 268. We find no error in the court's conclusion.

# Conclusion

[29]	Mother's due process rights were not violated by any alleged deficiency in the services offered to her by DCS. Further, the evidence supports the trial court's findings and those findings support the trial court's conclusions that the conditions under which Children were removed from Mother's care would not be remedied, that termination of Mother's parental rights was in Children's best interests, and that there existed a suitable plan for the care and treatment of Children following the termination of Mother's parental rights. Accordingly, we affirm.

[30]	Affirmed.

Crone, J., and Pyle, J., concur.